The following constitutes
the order of the court. Signed March 14, 2014

_William J. Lafferty, III_

William J. Lafferty, III
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| In re | Case No. 09-71053 |
| Lance E. Hart, | Chapter 7 |
| Debtor. | |
| Beverly Karaeff, Plaintiff, v. | Adversary No. 12-04059 |
| Lance E. Hart, New Horizon Investments, Inc., Defendants. | |
| In re | Case No. 11-42424 |
| Debra A. Hart, | Chapter 7 |
| Debtor. | |
| Beverly Karaeff, Plaintiff, v. | Adversary No. 11-04177 |
| Debra A. Hart, New Horizon Investments, Inc., Defendants. | |

**MEMORANDUM OF DECISION REGARDING PLAINTIFF BEVERLY KARAEFF'S ADVERSARY PROCEEDINGS AGAINST DEFENDANTS DEBRA A. HART AND LANCE E. HART**

United States Bankruptcy Court, Northern District of California

1

2     In these actions, Plaintiff Beverly Karaeff ("Karaeff") seeks (1) to have the amount of
3 certain debts allegedly owed to her by Debra Hart ("Debra"), Lance Hart ("Lance") and New
4 Horizon Investments, Inc. ("NHII") determined and (2) to have those debts declared non-
5 dischargeable pursuant to the provisions of Sections 523(a)(2)(A) (fraud), and 523(a)(4) (fraud
6 or defalcation by a fiduciary, and embezzlement) of the United States Bankruptcy Code (the
7 "Code"). The claims have their genesis in a failed real-estate development project involving
8 property located at 317 Shady Glen Road, Walnut Creek, California ("Shady Glen"), and
9 Karaeff's involvement in that project as an investor and/or lender.

10     Karaeff's adversary proceedings were jointly administered, and jointly tried, with those
11 of Plaintiffs Gary and Janette Drew ("Drews") who also sought the non-dischargeability of
12 alleged debts owed to them by the Defendants under 523(a)(2)(A) and 523(a)(4).  For the sake of
13 clarity in the Court's findings of fact and conclusions of law, separate memoranda of decision
14 were written for the respective cases of Karaeff and the Drews.  Filed contemporaneously with
15 this document, the Memorandum of Decision in the Drews' adversary proceedings will be
16 referred to herein as the "Drew Memorandum."

17     The overwhelming majority of the facts concerning Karaeff's financial involvement with
18 the Harts and their entities are contested.  Perhaps due to the nature of Karaeff's relationship
19 with the Harts, that of a family friend, the evidence presented on the transactions underlying
20 these suits was by and large offered through oral testimony – the basic sequence of events was
21 not conveyed with incontrovertible accuracy through any trail of documents.  Given the
22 divergence in the parties' respective accounts, the Court's findings of fact must be determined
23 through assessing each side's credibility as supporting, or in the alternative undercutting, facts
24 which are consistent, reasonable, and logical under the applicable context.

25

26

27

28

-2-

## SUMMARY OF DISPOSITION

Based on its findings of fact and conclusions of law, as set forth below, the Court determines the following. With respect to the causes of action for fraud by Debra under 523(a)(2)(A) arising out of Karaeff advancing $200,000 in August 2007, $100,000 in August 2007, and $100,000 in May 2008, Karaeff has met her burden in establishing all required elements for each transaction. These debts are determined non-dischargeable. Karaeff has failed to prove a case against Debra for her cause of action under 523(a)(2)(A) relating to the December 2007 $50,000 advance. With respect to any cause of action against Debra under 523(a)(4), by claims of defalcation by a fiduciary or embezzlement, Karaeff has not proven a case for non-dischargeability.

In her case against Lance, Karaeff has not established through imputation principles on a partnership theory, or alter ego or responsible person principles on a corporate theory, that he is responsible for the alleged debts pursuant to 523(a)(2)(A), and therefore no amount will be determined non-dischargeable under that section in Lance Hart's bankruptcy. With respect to any causes of action against Lance under 523(a)(4) for defalcation by a fiduciary or embezzlement, Karaeff has also failed to prove a case for non-dischargeability. No debt herein alleged by Karaeff to be owed by Lance is determined non-dischargeable.

## PROCEDURAL HISTORY

Lance filed a chapter 7 bankruptcy on November 18, 2009, and received a discharge on February 22, 2010. Debra filed a chapter 7 bankruptcy on March 4, 2011, and received a discharge on April 17, 2012.

On June 4, 2011, the Drews filed an adversary proceeding against Debra, Clyde Hart, Lance, and NHII. On June 6, 2011, Karaeff filed this adversary proceeding against Debra, Clyde Hart, Lance, Two Harts, Inc., Two Harts Construction & Development Incorporated, and NHII.

Motions to dismiss were filed in both adversary proceedings by Lance, Clyde Hart, and Two Harts Inc. These non-debtor defendants argued the Court did not have jurisdiction to enter a judgment against them, and a judgment could not be rendered nondischargeable against them

Case: 12-04059    Doc# 29    Filed: 03/14/14    Entered: 03/14/14 17:03:57    Page 3 of 45

1  because they were not debtors in the related bankruptcy case.  The Court granted both motions
2  and dismissed the adversary proceedings as to these non-debtor defendants.

3      Lance's bankruptcy case was re-opened on February 17, 2012, to allow two adversary
4  proceedings to be filed.  Both proceedings were filed on March 7, 2012.  One was filed by the
5  Drews against Lance.  The other proceeding was filed by Beverly Karaeff against Lance.

6      On March 20, 2012, a motion to consolidate proceedings was filed by the respective
7  Plaintiffs in each adversary proceeding.  The Defendants opposed the motions to consolidate
8  and a hearing was held on October 16, 2012, at the conclusion of which the Court consolidated
9  the four adversary proceedings.  Orders consolidating the proceedings were entered on October
10  25, 2012.

11      In November 2012, a motion for leave to amend the complaint was filed in both
12  adversary proceedings brought by Karaeff, and the adversary proceeding brought by the Drews
13  against the Harts.  Shortly thereafter, in the Drews' adversary proceeding and the adversary
14  proceeding brought by Karaeff against the Harts and their related entities, the Court approved a
15  stipulation allowing Plaintiffs to amend the complaint.

16      In February 2013, Lance Hart and Debra Hart brought separate motions for summary
17  judgment against Gary Drew and Janette Drew, and against Beverly Karaeff in the consolidated
18  adversary proceedings.  A hearing was held on March 7, 2013, and the motion was granted in
19  part and denied in part.  In partially granting the motion, the Court ruled that since there was no
20  evidence that Lance had personally made any false statements to the Drews, he could not have
21  any direct liability under Section 523(a)(2)(A), but that Plaintiffs might proceed under applicable
22  theories of imputed liability.  Although counsel for the Defendants/prevailing parties neglected
23  to upload an order granting the motion, the parties tried the matter in accordance with the
24  Court's ruling.

25      The matters were tried on April 1 - 4, May 6 - 7, and August 5, 6, 8, and 9, 2013.  At the
26  conclusion of the presentation of Plaintiffs' affirmative case in the trial, Defendants moved
27  orally for a Judgment on partial findings pursuant to Federal Rule of Bankruptcy Procedure
28  7052.  The Court granted that motion in part, ruling that because Debra and Lance did not make

-4-

direct statements to Karaeff regarding the August 27, 2007 and the December 10, 2007 loans totaling $150,000, any liability for these amounts by these debtors would be determined through the imputation of Toby's statements to them on a partnership theory. In open Court, Plaintiffs conceded this point. Nevertheless, the Court revisits the issue, herein, and will hold differently in Karaeff's case against Debra with respect to the $100,000 advanced on August 27, 2007, in light of a case not cited by the parties that the Court finds particularly instructive, *La Trattoria, Inc. v. Lansford (In re Lansford)*, 822 F.2d 902 (9th Cir. 1987), discussed *infra* in Section II.

On August 8, 2013, the Plaintiffs moved to amend their Complaint according to proof, which Defendants opposed. After considering the pleadings filed and the arguments of counsel, the Court granted the motion to amend the Complaint by memorandum entered September 6, 2013. Prior to that ruling, the First Amended Complaint was filed on August 27, 2013.[1]

The Court received post-trial briefs from the parties on October 15, 2013, and December 20, 2013. On October 16, 2013, Defendants moved to amend their answers to add certain affirmative defenses in the Karaeff adversary proceedings, which Plaintiffs opposed. The Court granted the Defendants' motion to amend, and Defendants filed their Amended Answer on January 31, 2014, at which point the matter was finally submitted.

---

[1] Although the Plaintiffs had, in open court on August 8, 2013, presented dismissals of certain causes of action against the Defendants, each First Amended Complaint ("FAC"), filed by Karaeff and the Drews respectively on August 27, 2013, contained those purportedly dismissed causes of action. In Karaeff's case against Debra, defalcation claims under 523(a)(4) that were "dismissed" as to $250,000 in loans made by Karaeff between August 27, 2007 and May 20, 2008 were pled in the FAC. Causes of action brought by Karaeff against Lance alleging defalcation in all transactions under 523(a)(4) that were "dismissed" were pled in the FAC. Nonetheless, Defendants did not object to the form of the FAC on grounds that it failed to comport to the dismissals. For the purposes of establishing the clearest record, and because the result of these proceedings is not changed by the exercise, the Court adjudicates the FAC as filed.

# I. FACTS[2]

**A.      The Harts and Their Entities**

      **1.      The Hart Family**

Debra has been a licensed real estate broker in California for over thirty years, with experience in the Walnut Creek area since 1985. She has, over time, worked at a number of different real estate brokerages. Clyde Hart (referred to throughout the trial as "Toby", and so referred to here) is Debra's husband. Toby, who is not currently a debtor in bankruptcy, and is not a defendant in this adversary proceeding, is also a licensed real estate broker in California.[3] Toby has also had extensive experience remodeling and building homes since 1978, and has had some experience in developing real estate projects. Toby served as President and CEO of Moss & Moss Realtors during the early 1980's, while also working on real estate-related projects. In 1985, Toby and Debra relocated to the East Bay, and Toby became Regional Vice President, Real Estate division, for Great Western Bank ("GWB"), from 1985 through 1996. Although Toby retired from his job at GWB in 1996, he has continued to buy, develop, build and sell real estate from 1996 until the present. Toby's post-retirement projects included continued work in the home repair and remodeling field, initially as a roofer, under the guise of a number of different corporate entities. As time went on, Toby branched out into more extensive remodeling and construction jobs, again via the use of various corporate entities. Lance is Toby and Debra's son, and has been involved with his father in his various roofing, remodeling and construction businesses since he was sixteen years old. Lance is a licensed contractor. At the time of the trial, Lance was employed by Two Harts Construction and Development, Incorporated, a company which he owns. Trial Tr., 206:3, 7, 217:8-25, Apr. 2, 2013.

Over the years, Debra, Toby and Lance worked jointly on a number of real estate projects. Some of the projects on which the Harts worked were for their own account: Lance's

---

[2] The following facts constitute the Court's findings of fact pursuant to Federal Rule of Bankruptcy Procedure 7052.

[3] Toby Hart is a defendant in an action currently pending in state court, *Beverly Karaeff v. Clyde Hart et al.*, No. 12-01087 (Contra Costa County Superior Court, filed May 9, 2012).

former residence on Beale Road in Walnut Creek began as a project on which he did substantial remodeling. When the project was complete and take-out financing was acquired, the property was deeded into NHII, which took the financing as "profit" on the deal, and Lance used the property as his residence. Similarly, 125 Canada Via, Diablo, California, ("Canada Via") Debra and Toby's home during the relevant period for these matters, was a substantial remodeling and construction project undertaken by Toby and Lance, and was owned initially by NHII.

## 2. New Horizon Investments, Inc.

NHII is a suspended California corporation.  It was formed in September 2002 by Debra as a vehicle through which to take her real estate sales commissions (to minimize her tax liability).  As of June 2004, Debra and Toby jointly owned a sixty percent (60%) equity interest in NHII; Lance owned the remaining forty percent (40%) equity.  Debra was the President and Toby was the Secretary of the company, at least initially.  Although the testimony at trial was less than crisp, the Harts contended that Toby became the President of NHII at or around June 2004, and Debra became Secrerary of NHII at that time.  Lance served as Chief Financial Officer and Vice-President of NHII during the period of formation of GTP Properties Ltd., a partnership described below, and throughout the transactions covered herein, and was the only person authorised to write checks against NHII's checking account.  Those facts notwithstanding, the testimony of the Harts at trial was that Lance had no particular expertise or background in financial matters, took direction from Toby on all matters involving NHII, including payables, and had no awareness whatsoever of the existence of GTP Properties Ltd., in which NHII was the sole general partner, until the commencement of this litigation.  There is some evidence that Debra was Secretary as of August 1, 2006 when she signed a grant deed in that capacity. Although Debra claims to have divested herself of her equity interest in NHII and to have resigned as an officer of NHII as of May 2006, both of those assertions were challenged by the Plaintiffs.  Further background on the Harts' treatment of and interaction with NHII is included in the Drew Memorandum.  *See* Mem. of Decision Regarding Pls. Gary and Janette Drew's Adversary Proceedings against Defs. Debra A Hart and Lance E. Hart, Part I Section A, March

-7-

14, 2014.

### 3. Two Harts, Inc.

Two Harts, Inc. ("Two Harts") was a California corporation formed originally by Troy Hart, Lance's brother, to work on construction projects. The original shareholders were Troy and his wife Margaret. Prior to the commencement of construction on the Shady Glen project, Margaret was removed as a shareholder in Two Harts, and Lance took her place. Lance later placed his contractor's license into Two Harts, and used the company to work on various real estate projects, including Shady Glen, for which Two Harts was the construction supervisor and general contractor. Trial Tr., 52:1-2, Apr. 4, 2013; Trial Tr., 43:9-21, Aug. 6, 2013.

### 4. GTP Properties Ltd.

GTP Properties Ltd. ("GTP") was a limited partnership the Harts used from time to time in efforts to develop the Shady Glen property. NHII was the general partner of GTP. The partnership sought to raise capital through subscribing partnership interests from limited partners. In theory, funds from the limited partners' subscriptions would allow for the acquisition of real property by the partnership and finance construction of a home, or homes, on that property. The Harts first used GTP to raise capital in June 2004. That effort, according to the partnership documents, was for the construction of two homes at the Shady Glen site. The details of that partnership are chronicled in depth in the Drew Memorandum. In Karaeff's case, she alleges that she entered into a limited partnership agreement with NHII and joined GTP for the exclusive development of "Lot B", described below. For the purposes of this discussion, that alleged partnership will be referred to herein as "GTP II" because though it concerned the development of only one home on one lot, it was otherwise generally similar in structure and design to GTP's 2004 iteration.

### B. Karaeff and her Relationship with the Harts

For at least twenty years, Karaeff worked for Ross Stores, Inc. Through the middle of 2008, she was working as an "allocation appointing manager" at the Ross corporate office in Pleasanton, California. Debra met Karaeff at an open house that Debra hosted in 2004. Debra listed and sold Karaeff's Oakland home in 2004 and was Karaeff's agent when she purchased a

-8-

home in the Harts' Diablo neighborhood that year. Toby and Lance remodeled that home for a total cost of approximately $300,000. During this time, Karaeff became a close friend of Debra, Toby, and the Hart family generally. She was a fixture at their Diablo home at Canada Via, having dinner there frequently between 2005 and 2009. Neither side sought to characterize Karaeff as a sophisticated investor and/or lender in real estate development ventures, and nothing proven during the trial would support such a characterization. She was a friend of the Harts, and particularly of Debra, until Debra filed bankruptcy in 2011.

### C. Shady Glen

Shady Glen was a 2.21 acre parcel of undeveloped land on a hillside in Walnut Creek, California. NHII acquired Shady Glen from Eugene Wolsky via a "Vacant Land Purchase Agreement," dated as of September 2, 2003, that called for the property to be transferred to NHII for a total price of $1,200,000, with a closing to occur on January 9, 2004. Pls.' Trial Ex. 1. Although Wolsky gave NHII a Grant Deed dated January 23, 2004, in fact the escrow for the transaction did not close, and the Deed was not recorded, until July 2, 2004, when NHII provided Wolsky the proceeds of a loan in the amount of $800,000 from Sequoia Mortgage Capital ("Sequoia"). Defs.' Trial Ex. 2.

Thereafter, NHII effected a lot split into what would be known as "Lot A" and "Lot B", each slightly larger than one acre. Toby and Debra, acting through NHII as corporate general partner, formed GTP in 2004 for the ostensible purpose of building homes on Lot A and B, respectively. That project experienced challenges which will not be detailed here. In 2006, Toby and Debra, through their roles in NHII, transferred both lots to Debra, personally, as her sole and separate property. Lot B was deeded to Debra on August 1, 2006. Lot A was deeded to Debra on September 7, 2006. Each deed was recorded shortly after its execution.

When Karaeff entered the scene as a lender and/or an investor, Debra owned the entire property. The house on Lot A was under construction, financed through a construction loan from Washington Mutual Bank ("WAMU") in the total amount of $1,837,500 which was secured by a deed of trust on Lot A. Lot B was undeveloped at that time and secured obligations to Sequoia. Sequoia held deeds of trust on Lot B for $400,000, securing a loan Debra obtained

-9-

on August 1, 2006, and $200,000, securing a loan Debra obtained on October 19, 2006. The testimony at trial was express and uncontroverted that by the time of Debra's acquisition of Shady Glen in 2006, she had decided not to build a house on Lot B.

### D. Transactions between Karaeff and the Harts or their Entities

There are four transactions between Karaeff and the Harts concerning alleged debts which Karaeff contends are non-dischargeable: (1) the August 15, 2007 $200,000 obligation (it is disputed whether it was a loan or an investment); (2) the August 27, 2007 $100,000 loan; (3) the December 10, 2007 $50,000 loan; and (4) the May 20, 2008 $100,000 loan. The Harts testified that all of Karaeff's dealings were with Toby – that Toby received all funds, that Debra was not present when Karaeff gave Toby any money, that she was not present when any financial agreements were discussed, and that she was not present when Toby purportedly gave notes to Karaeff. Toby testified that he did not first disclose the existence of agreements between himself and Karaeff to Debra until either very late in 2010 or early in 2011.

Karaeff testified that Debra was directly involved in the $200,000 obligation, which she characterized as an investment, and was aware of all subsequent loan transactions. Debra categorically denied knowledge of all transactions. Notably to the contrary, however, Debra revealed in a very candid declaration filed under penalty of perjury in Contra Costa County Superior Court that Karaeff lent her money, though that declaration was not specific as to time or transaction.[4]

As to Lance, there is no evidence put forth by either side, or any allegation for that

---

[4] "As Beverly stated, she loaned me money at a time I or anyone else that I know of had any idea that the economy could possibly get to where it is today" was Debra's declaration made in connection with Karaeff's petition for a TRO in Contra Costa County Superior Court in May 2011. Trial Tr., 209:5-7, May 6, 2013. When confronted with the statement on cross examination, Debra said that she was stating Karaeff's understanding which may not have been accurate. It seems more likely that Debra, through this statement, acknowledged borrowing money from Karaeff. It is difficult to determine, based on the declaration's language, when Debra became aware of the loans. Debra testified in this trial that she became aware of the loans only shortly before the TRO hearing. Debra's knowledge of the loans at the time of the TRO hearing cannot necessarily be applied retroactively to the dates of the loans. The statement fairly read, including the commentary on economic downturn, at least implies that Debra was aware of the loans before the real estate market's decline. While conclusions are not easily drawn from this statement, it is noted as potentially some evidence of Debra's general knowledge of loans from Karaeff to herself and/or Hart family enterprises.

-10-

matter, that he was directly involved in obtaining funds from Karaeff. Lance testified that it was not until his deposition, taken in September 2012, that he knew any money was ever obtained from Karaeff, though this is called into question by his depositing certain checks, described hereafter, from Karaeff into the Two Harts checking account.

### 1. The First $200,000 – August 15, 2007

On August 15, 2007, Karaeff wired $200,000, an advance on her WAMU home equity line of credit, to the account of Two Harts, Inc. The events that gave rise to the transfer are disputed. By any account, it is not disputed that the $200,000 was to have been paid back to Karaeff within one year. Testimony again diverged on the nature of the obligation and the parties involved.

Karaeff testified that in August 2007, while the two were driving home from a dinner, Debra told Karaeff that she needed to "get her money working for her." Karaeff Decl. 2. Karaeff testified that as a result of Debra's involvement in the sale of her Oakland home and the purchase of her Diablo home in 2004, Debra knew Karaeff had substantial equity in the new residence. In the following days, Karaeff said that Debra brought her to the Shady Glen property site, showed her the house on Lot A saying it would be completed in 30 to 45 days, and showed her the property lines for Lot B. According to Karaeff, Debra also told her that the property was free and clear of liens. Then, Karaeff said, Debra again told her that she needed to get her money working for her and that it was time she became a partner. Karaeff Decl. 3.

According to Karaeff, when the loan officer at her bank told her she would only qualify for a $60,000 loan, Debra directed her to a loan officer whom she knew at WAMU. Following up on that advice, over the next two days Karaeff sought and obtained a $500,000 line of credit from WAMU against her residence.

Karaeff stated that she initially only wanted to invest $100,000 in the partnership, but over dinner Debra and Toby convinced her to commit $200,000, telling her that they needed money immediately to obtain permits and plans for Lot B.

Karaeff said that the $200,000 was an investment for the development of Lot B through GTP II as described by the parties' Limited Partnership Agreement ("LPA", Pls.' Trial Ex. 75)

-11-

and a Subscription Agreement ("SA", Pls.' Trial Ex. 74). She produced these agreements, each signed by Karaeff and Toby as President of NHII and dated August 17, 2007. The LPA contemplated 96 limited partnership units, at $25,000 each with a minimum contribution of four units, for total capital of $2,400,000. Of this amount, $1,400,000 would be used to purchase the land from the general partner, NHII, and the remaining $1,000,000 would fund construction. As previously noted, Debra herself and not NHII owned the entire property, including Lot B, at the time that Karaeff and Toby signed these documents. The SA included a provision that in the event of partnership under-subscription, the general partner would promptly notify the subscribed investors and promptly return, in full, all subscription monies. Pls.' Trial Ex. 74, at 1.

Karaeff testified that Debra gave her the partnership documents to review during a meeting in the family room of the Harts' Diablo home with Toby present. According to Karaeff, this exchange occurred two days before the $200,000 was wired, that is on or around August 13, 2007. She then reviewed the documents, returned to the Harts' home, and signed another set of the same documents on or around August 17, 2007. Her testimony is that Toby gave her that second set, identical to the documents that she had previously reviewed, and she signed them in the Harts' kitchen with Debra present.

Debra's testimony on this subject differed significantly. She stated, somewhat categorically, "I did not discuss money with Beverly" and "[t]here were no discussions about money between Beverly and I or in my presence." Trial Tr., 197:13, 201:11-12, May 6, 2013. When asked about a statement to Karaeff to the effect of "you need to get your money working for you" Debra testified, "No, I don't recall that." Trial Tr., 192:6, May 6, 2013. Debra did admit that she told Karaeff that WAMU was a lender known to be giving equity lines of credit at that time, but that her conversation with Karaeff was brief on this point. She could not remember whether she knew the amount of Karaeff's credit line. As for the visit to Shady Glen, Debra stated repeatedly that she and Karaeff went to the property to pick paint colors for the Lot A house, a talent for which Karaeff was known.

According to the Harts, Debra was never involved in business dealings with Karaeff; rather, Toby handled everything. Toby maintained that he never approached Karaeff about

-12-

committing money, rather she came to him.  He testified that in August 2007, Karaeff was dissatisfied with her position at Ross Stores and wished either to quit or go on disability.  He said that she had calculated the amount of interest income she would need to earn to supplement her disability income.  Karaeff denied that she ever told Toby that she was thinking about leaving Ross.  In fact, she worked at Ross through the middle of 2008.

Toby testified that the $200,000 advance was a loan from the outset, between Karaeff and himself personally, and not an investment in any partnership.  Defendants provided what purports to be a promissory note also dated August 15, 2007 reflecting a $200,000 loan from Karaeff to Clyde Hart, individually, at twelve percent (12%) interest.  Defs.' Trial Ex. 43.  Karaeff testified that she never received this or any other promissory note in connection with her dealings with the Harts.[5]  Karaeff directly disputed the Harts' account which was that Debra was not at these meetings and that Toby gave her all partnership-related documents.  Toby did admit, and Lance confirmed, that none of the $200,000 went to the development of Lot B.

In an effort to explain the existence of the signed SA and LPA, Toby testified that he discussed the agreements with Karaeff in the garage of the Harts' Diablo home.  He maintained that the parties never entered into the LPA, because he was not sure that he would ever develop Lot B.  This agreement, as recounted by Toby, was a "backup and probably would never happen."  Trial Tr., 242:10-11, Aug. 8, 2013.  According to Toby, the partnership agreement, if enacted, could allow Karaeff to receive a return in excess of the twelve percent (12%) interest under the alleged promissory note.  He recalled the garage conversation with remarkable clarity, saying "I can remember the conversation with Beverly, I can remember the context of the conversation, I can remember her understanding of the conversation..."  Trial Tr., 242:7-10, Aug.

_____

[5] The Harts offered the testimony of escrow officer Jack Babcock, who had done frequent business with Toby over the course of seventeen years in various roles including serving as escrow agent and assisting in the drafting of lending documents, i.e. promissory notes and deeds of trust.  Babcock was asked if he could identify notes that Toby testified he gave Karaeff.  Defs.' Ex. 43-46; Trial Tr. 160, August 8, 2013.  He testified that he could identify them, from the language of particular provisions therein, and that he had prepared each note at Toby's direction.  Babcock was not asked when he prepared each note or whether he specifically remembered drafting the notes on the dates written on each note.  There was no testimony that Babcock delivered the notes to Karaeff or otherwise had knowledge of their delivery.

-13-

1  8, 2013.  Toby said that he would never have had that conversation about the Limited
2  Partnership in front of his wife who owned the entire property, intended to live on Lot A, and did
3  not want Lot B developed.  He maintained that Debra was not present when he handed the LPA
4  to Karaeff.  Toby testified that he never disclosed to Debra that he had prepared and Karaeff had
5  signed the SA and LPA.

### 2. Subsequent Loan Transactions Totaling $150,000

7  On August 27, 2007, Karaeff wrote a check to Two Harts, Inc. for $96,250 which
8  represented a $100,000 loan for a 90 day term at fifteen percent (15%) interest with projected
9  interest subtracted from the loan amount.  Lance endorsed and deposited the check, though he
10  maintained that he did not know what the money was for.  On December 10, 2007, Karaeff wrote
11  another check in the amount of $46,151 also payable to Two Harts, Inc.  Though he had
12  difficulty identifying the endorsement signature as his own, Lance appeared to agree that he
13  endorsed and deposited the check from Karaeff.  Lance said he would not have known for what
14  the money was intended.  Again, the testimony by Karaeff and Toby differed substantially.

15  Karaeff recalled that on the day she agreed to lend the funds, August 27, 2007, Toby
16  came to her house and asked for $100,000.  According to Karaeff, Toby said that there was a
17  bank loan for the construction of Lot A and that they were not receiving their draws on schedule.
18  He said that he needed $100,000 to finish the house on Lot A.  Karaeff testified that she received
19  no promissory note for this loan.

20  According to Karaeff, Toby again came to her in early December, asked for $50,000, and
21  said that he needed it to finish the house on Lot A.  Karaeff testified that the $46,151 amount
22  represented a $50,000 loan for a 30 day term at fifteen percent (15%) interest with projected
23  interest subtracted from the loan amount.[6]  Karaeff again denied receiving the note that the
24  Defendants offered as an exhibit.  Defs.' Trial Ex. 45.

25

26  [6] According to the Court's calculation, this does not add up.  Monthly interest on $50,000 at 15% would be
$7,500.  And in general, the agreements and interest rates as testified by the parties are included in this
27  Memorandum primarily for the purpose of conveying the bargains that the parties believed they were entering into
and the payments which resulted.  The Court has not used arithmetic mistakes, so testified, in its assessment of the
28  parties' credibility.  There appear to be inaccuracies in the figures set forth by both sides.

-14-

Karaeff said that she received her first interest payment on February 20, 2008 in the amount of $1,750, which represented combined interest for the $100,000 and the $50,000 loans. A second payment of $2,000 followed on March 18, 2008 for the same two obligations. This check bounced. It was "replaced" by a $2,074 payment received on March 31, 2008. Karaeff said that $1,875 was paid on May 5, 2008 which was a late payment for the April interest. The sum of $3,750 was paid on May 29, 2008, which Karaeff says was for May and June interest.

Toby's testimony was materially different on the subject of the August 27 $100,000. Consistent with his contention that the initial $200,000 was a loan, he testified that ten days after the money was lent, Karaeff came back to him and said she needed a higher rate of return. According to Toby, Karaeff committed another $100,000 and agreed to return the partnership agreement which was now void and would never be put into place. Toby testified that Karaeff would earn fifteen percent (15%) interest on the total $300,000 for a monthly interest payment of $3,750. Defendants presented a promissory note for $300,000. Defs.' Trial Ex. 45. Karaeff testified that she never received the $300,000 note and never received payments from Toby of $3,750 as interest for that alleged obligation; that she believed Toby lied under oath when he said he gave her notes and made payments.

As for the December 10 $50,000, Toby did not testify regarding the surrounding details of this loan – he merely acknowledged borrowing the money, and said he gave Karaeff a note separate from the alleged $300,000 note. Toby took a different view on why the check amount was $46,151, testifying that the deduction was not prepayment of interest for the subject loan but rather payment of interest due from November and December 2007 on what he alleges was a $300,000 note.

### 3. The "Mendelson" $100,000

On May 20, 2008, Karaeff wrote a check in the amount of $100,000 payable to Two Harts, Inc. According to the parties, this amount was to be transferred to a Mr. Kyrille Mendelson ("Mendelson"). Toby and Mendelson had frequent business dealings and according to Toby it was their practice to loan each other money without documenting the transactions with notes. Although the parties disputed whether Mendelson actually received the funds, the May

-15-

2008 loan was referred to over the course of these proceedings and will herein be referred to as the "Mendelson $100,000."

Karaeff's account is that she was having dinner and watching television with Toby and Debra on May 20, 2008. Toby was on the phone, stopped his conversation, and asked Karaeff if she would like to make a quick $6,000 through loaning an associate of his $100,000 that would be paid back in 30 days at six percent (6%) interest. It was later revealed to Karaeff, by Toby, that this associate was Mendelson. Karaeff stated that Debra was present, the two looked at each other, and Debra smiled saying "it will be fine." Karaeff Decl. 5.

After 60 days, when she had not received payment, Karaeff inquired of Toby when payment would be received. Karaeff testified that Toby told her the money had been lost and that because he vouched for Mendelson he would treat the debt as his own and pay fifteen percent (15%) interest. Karaeff said that she never received a promissory note for this loan – either initially or when Toby took responsibility for its payment.

On July 14, 2008, a $7,800 check was issued to Karaeff, and signed by Toby, payable from the Two Harts account that in Karaeff's understanding included $6,000 in interest on the Mendelson loan. Karaeff said that the remainder sum of $1,800 should have been $1,875, one month's interest on the $150,000 in loans, but Karaeff did not then make an issue of it. In any event, that check bounced.

Toby's version, again, is that Karaeff came to him looking for an opportunity to make money quickly. He recalled the evening described by Karaeff – both Karaeff and Toby remember watching the same television program at the Harts' home on the night that the Mendelson money was committed. In contrast to Karaeff's testimony, Toby testified that the money was "committed" on May 7, 2008, and not paid until May 20, 2008. He was unable to explain with any credibility how the $100,000 was transferred out of Two Harts to Mendelson.

It was not disputed that Karaeff's $100,000 was included in a deposit amount of $133,550 into the Two Harts account on May 22, 2008. When asked to review copies of all checks written on that account from May 2008, Toby could not identify a $100,000 check to Mendelson that would evidence the transfer of the Karaeff funds to Toby's associate.

-16-

1  Mendelson did not testify in this trial.  But in deposition testimony read into the record,

2  Mendelson testified that he did not receive a $100,000 loan from Toby in 2008 – that borrowing

3  between them ceased because the two were financially strapped.

4      Toby attempted to explain how he transferred the Karaeff money to Mendelson.  On May

5  7, 2008, there was a $43,000 cash withdrawal from the Two Harts account.  Toby testified

6  without any documentary verification that this sum went to one of Mendelson's companies.

7  When cross-examined as to how $100,000 was ever paid out of Two Harts to Mendelson, Toby

8  said that $50,000 must have been paid out of another Two Harts account.  The Court surmises

9  that Toby was testifying that the $43,000 documented withdrawal, added to the $50,000

10  undocumented, unproven withdrawal, would result in $93,000 to Mendelson with origins in the

11  Karaeff $100,000.  Notably, this understanding is inconsistent with evidence coming from the

12  Harts' own side.  Lance had previously testified that there was only one Two Harts checking

13  account.  No evidence of a second account's existence was presented over the course of the trial.

14      Toby acknowledged that he never received a note from Mendelson and did not initially

15  give Karaeff any note to document their agreement on the $100,000.  Instead, when Karaeff

16  came to him and pressed him for payment which he knew was not forthcoming from Mendelson,

17  he accepted the debt as his own and wrote her a note dated January 10, 2009.  The note was for a

18  one year term.  It did not specify a percentage rate for interest; rather, it stated that $6,000 in

19  total interest would be paid.  Defs.' Trial Ex. 46.  Of course, Karaeff denied receiving any note.

20              **4.    The Consolidated $500,000 Loan**

21      Karaeff testified, candidly, if not with great sophistication, that the limited partnership

22  "expired" on August 27, 2008 and was replaced by a new agreement she had with Toby.  There

23  was no clear testimony regarding when this new agreement was entered into – from the context,

24  it is clear that this happened some time in the fall of 2008, certainly before interest payments

25  began in December 2008.  Karaeff and Toby agreed that they added the $450,000 in funds

26  previously advanced, added in missed interest payments, and rounded the resulting figure to

27  $500,000.  By all accounts, this was an oral agreement.  Toby agreed to pay Karaeff fifteen

28  percent (15%) interest on this amount, which at this point, given the lapse of any partnership, can

-17-

properly be characterized as a loan. Karaeff testified that Debra requested the interest rate be lowered to twelve percent (12%), and this was done. Not surprisingly, the Harts disputed any allegation that Debra had knowledge of this or any other lending arrangement. Payments of $5,000 on this note began on December 4, 2008, and continued through January and February 2009. There were no further payments.

In July 2009, Karaeff, joined her boyfriend Joseph Farais, her mother, and her step-father, confronted Toby about his failure to pay on the consolidated loan or even to supply Karaeff with any evidence of indebtedness, i.e. notes. This family meeting occurred at Karaeff's home in Diablo. Debra was not present at the meeting, and Toby said that he did not tell her about the meeting. At this time, Karaeff learned that Lot B had been lost to foreclosure. A trustee's sale of Lot B had occurred on March 13, 2009. In July or August 2009, Karaeff undertook an investigation of public records and learned, for the first time, of the liens on the Shady Glen property. Lot A was later foreclosed upon and sold on February 11, 2010.

-18-

## II. KARAEFF'S CAUSES OF ACTION AGAINST DEBRA[7]

Over the course of these proceedings, as described thoroughly in the Drew Memorandum, the Court was struck by the Harts' consistent failure to offer rational, sensible, candid explanations regarding the transactions giving rise to these disputes. The "story" to which the Harts testified, as regarding most disputed facts, ranged from implausible, to logically inconsistent, to entirely self-serving. Frequently, in combative and defiant statements, the Harts relied on facts not proven during this trial or documents so unreliable that the Court, in one instance, determined a document offered in the Drews' case to be a forgery. *See* Mem. of Decision Regarding Pls. Gary and Janette Drew's Adversary Proceedings against Defs. Debra A Hart and Lance E. Hart, Part II Section D, March 14, 2014. For these reasons, the Court bases its conclusions of law, below, in large part on the facts it finds and determines through the credible testimony of Beverly Karaeff.

### A.    523(a)(2)(A) regarding the August 15, 2007 $200,000

Determining a debt non-dischargeable under 523(a)(2)(A) requires the finding of five elements: (1) that the debtor made the statement; (2) knowing the statement was false; (3) with the intent to deceive or induce reliance; (4) that such reliance was induced and was justifiable under the circumstances; and, (5) that damages resulted. *See, e.g., In re Eashai*, 87 F.3d 1082, 1086 (9th Cir. 1996). At the outset, the Court must determine what statements, if any, were made by Debra that induced Karaeff's transfer of $200,000 on August 15, 2007.

### 1.    The Debtor Made the Statements

As seen above, the facts regarding the initial $200,000 advance were hotly contested. Based on the evidence offered and the character of the witnesses' presentation, this Court concludes that Karaeff's testimony is significantly more believable than the Harts' testimony with respect to the issue of whether Debra was involved in the $200,000 advance or in any transaction thereafter. In light of Debra's awareness of Karaeff's significant home equity, it

---

[7] The following discussion, in the respective cases of Debra and Lance, constitutes the Court's conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

-19-

makes ordinary, if somewhat cynical, sense that when the construction on Lot A was held up by delays in receiving construction draws, Debra would attempt to obtain funds from Karaeff by telling her that she "needed to get her money working for her." While this is not a false statement in itself, it indicates Debra's involvement in soliciting money from Karaeff and also goes to her role in inducing Karaeff's reliance.

The Court finds that Debra made the following statements to Karaeff with regard to the $200,000 transferred August 15, 2007 for the development of Lot B through what Debra and Toby represented to be a limited partnership: (1) Debra told Karaeff that $200,000 was needed immediately to begin construction on Lot B; (2) Debra gave Karaeff the SA, which included the statement that, in the event of under-subscription, all subscription monies would be returned to the limited partners; (3) Debra gave Karaeff the LPA, the stated primary purpose of which was the development of Lot B; and, (4) Debra told Karaeff that the property was free and clear of liens. All of these statements were false.

It could be argued that Debra herself did not make the statements found in the SA and LPA and that any false statements within these documents are only attributable to NHII. However, courts have consistently held individuals responsible for statements made in partnership documents where those individuals are closely affiliated with the affairs of the partnership or its management and the individual aids in preparing the documents, delivering the documents, or otherwise causing the documents' statements to be communicated. *Sherwin Williams Co. v. Grasso (In re Grasso)*, 497 B.R. 434, 442-443 (Bankr. W.D. Penn. 2013) (finding the debtor to be an "insider" of the general partnership through analysis of 11 U.S.C. § 101(31); therefore, statements in partnership documents were attributable to the debtor); *Park v. Moorad (In re Moorad)*, 132 B.R. 58, 62 (Bankr. N.D. Okla. 1991) ( holding that "[b]y causing the [private placement memorandum] to be prepared and circulating it with the intent others rely on it in making investment decisions, [debtor/defendant] became responsible for the veracity of its contents."). This Court also concludes that Debra is responsible for the falsity of these statements.

And while there is no evidence that this $200,000 ever reached Debra in her individual

-20-

1    capacity, the United States Supreme Court has held that the debtor need not receive a benefit for

2    a debt obtained through their fraud to be determined non-dischargeable. *Cohen v. De La Cruz*,

3    523 U.S. 213, 221 (1998); *see also*, *Ghomeshi v. Sabban* (*In re Sabban*), 384 B.R. 1, 6 (B.A.P.

4    9th Cir. 2008).

5            Finding clear statements, both oral and written, by Debra to Karaeff with regard to the

6    lien-free status of Lot B and its proposed development through GTP II, the Court next considers

7    the nature and effect of those statements under the remaining elements of 523(a)(2)(A).

8                            **2.      Knowing the Statements were False**

9            The Court concludes that Debra knew that these statements were false when she made

10   them.  In a different testimonial context, Debra admitted that she had no intention to develop Lot

11   B at the time she convinced Karaeff to invest as a limited partner for Lot B's development.  She

12   stated that she wanted to live in the home on Lot A, without the inconvenience of a neighboring

13   residence on Lot B.  Toby admitted that none of the $200,000 was used for the development of

14   Lot B.  It is abundantly clear that the Harts had no plans to build a house on Lot B which, as

15   represented to Karaeff, would be sold and profits distributed to partners within one year.  The

16   statements in the SA were also false, and the Court determines that Debra knew this at the time.

17   Karaeff's eight partnership shares were the only shares subscribed of the 96 required to fully

18   subscribe the partnership.  Even with this substantial under-subscription, Debra never attempted

19   to return Karaeff's investment.  Finally, the property was not free and clear at the time that

20   Karaeff committed her $200,000.  Both Lot A and Lot B secured various debt obligations in

21   August 2007.  Lot A had the construction loan against it, in the approximate amount of

22   $1,800,000, secured by a deed of trust held by WAMU.  Lot B had at least one deed of trust

23   against it securing an obligation, or obligations, to Sequoia.

24                           **3.      Intention of Deceiving, Inducing Reliance**

25           After finding false statements, that Debra knowingly made, it is easily determined that

26   Debra intended to deceive Karaeff and induce her reliance on those statements.  Debra supplied

27   partnership documents for GTP II, a sham "partnership" which was never formed, and was never

28   intended to be formed.  Debra made other oral false statements regarding the development of Lot

-21-

B, which in Debra's own admission was never going to happen on her watch. Debra also convinced Karaeff to commit $200,000, after Karaeff expressed that she was initially inclined to invest $100,000. Debra's intention to deceive Karaeff is immediately apparent from the obvious ruse of a partnership that was never formed and was never intended to achieve its stated purpose.

### 4.    Justifiable Reliance

The Supreme Court, drawing from the Second Restatement of Torts, set forth the standard for justifiable reliance in *Field v. Mans*, 516 U.S. 59 (1995), with its holding that "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id* at 71. The Court determines that Karaeff's reliance on Debra's statements was justifiable.

Karaeff and Debra were close friends. Karaeff had no prior experience in real estate development through a partnership. She trusted the expertise of her friend, Debra, who convinced her that the investment was a good idea through any number of statements both oral and contained within the partnership documents Debra supplied her. Under these facts, justifiable reliance is established without difficulty.

### 5.    Damages

Karaeff was damaged as a result of her reliance on these false statements by Debra. Karaeff subscribed $200,000 in a partnership that was never fully subscribed, her money was not returned to her, and the money was not used to develop the Lot B property for which it was committed.

Based on the foregoing, all elements of 523(a)(2)(A) established, this Court determines that the $200,000 investment is non-dischargeable in the bankruptcy of Debra Hart.

### B.    523(a)(2)(A) Regarding the August 27, 2007 $100,000 Loan and December 10, 2007 $50,000 Loan

Over the course of this trial, Debra's role in any transaction involving Karaeff was the subject of much dispute. Karaeff conceded that Debra was not present when Karaeff and Toby entered into the August 27, 2007 loan for $100,000 and the December 10, 2007 loan for $50,000.

-22-

After eight days of trial, on August 8, 2013, Defendants brought a Rule 52 Motion for Judgment on Partial Findings. Although the Court had hoped that this Motion would be brought in writing so that the Court, and Plaintiffs' counsel, could better respond to its requests for relief and underlying arguments, the Motion was made orally as a colloquy between Defendants' counsel and the Court, with the occasional oral opposition or other feedback from Plaintiffs' counsel. At the conclusion of the discussion concerning the motion, the Court determined that Karaeff was not alleging any direct involvement by Debra and Lance regarding the August 2007 $100,000 and December 2007 $50,000, and must prove this aspect of her case, if at all, by resort to imputation of Toby's fraudulent statements on a partnership theory.

While the Court so held after Defendants' oral Motion, after more considered review of the factual record and controlling Ninth Circuit authority, the Court will *sua sponte* reconsider that aspect of its decision. Such reconsideration is appropriate given the Court's independent responsibility to make its conclusions of law after deliberation which may include consideration of case law not cited by counsel. For the reasons stated below, the Court finds that Debra was directly involved in the August 2007 $100,000 such that under the law of this Circuit that debt is non-dischargeable in her bankruptcy. Given the facts and circumstances of this transaction, the Court need not find a partnership with Toby and resulting imputation through a partnership theory. On the other hand, Debra was not sufficiently involved in the December 2007 $50,000 in a manner that would support non-dischargeability as to her.

Although the elements of 523(a)(2)(A) are technical, and should be applied with precision, it is not inconsistent with that charge for a court to consider a broad factual context when assessing fraud. It is established Ninth Circuit doctrine that the debtor's intent to deceive under 523(a)(2)(A) may be inferred and established from the surrounding circumstances. *In re Ettell*, 188 F.3d 1141, 1145 (9th Cir. 1999) ("[b]ecause fraud lurks in the shadows, it must usually be brought to light by consideration of circumstantial evidence."); *see also In re Hultquist*, 101 B.R. 180 (B.A.P. 9th Cir. 1989). Under the totality of the circumstances standard, the Court must determine which parties were involved in alleged fraud and then determine whether the requirements of non-dischargeability are established based on a given party's

-23-

1 involvement. Here, the first step involves defining Debra's role, if any, in the two transactions.
2 Next, those actions must be assessed to determine whether Debra's intent was fraudulent such
3 that it may support a finding of non-dischargeability.

### 1. The August 27, 2007 $100,000

5       Under the facts and circumstances of this case, and after taking into account witness
6 credibility on disputed assertions of fact, this Court finds that Debra had knowledge and intent to
7 defraud Karaeff such that Debra is responsible for the $100,000 obtained by Toby on August 27,
8 2007. Debra's own affirmative conduct induced Karaeff to advance the funds. By assessing
9 those actions, the Court finds fraudulent intent by Debra. It is of no consequence that Debra was
10 not physically present when Karaeff advanced the $100,000 to Toby.[8]

11       The Court determines that Debra was directly involved in the August 27 transaction in
12 the following ways: (1) Approximately one month earlier, in July 2007, Debra told Karaeff on
13 two occasions that she needed to get her money working for her; the Court has already found
14 that Debra was aware of Karaeff's equity in her home and instrumental in helping Karaeff obtain
15 the line of credit that would finance the $100,000 advanced on August 27, 2007; (2) Debra made
16 false and misleading statements to Karaeff regarding Lot A – the development project that would
17 purportedly benefit from the $100,000 loan. Debra took Karaeff to Shady Glen, showed her the
18 house on Lot A and said that it would be completed within 30 to 45 days. Whether this
19 statement was false when made or an overly optimistic projection could be argued. But Debra
20 also said that the property was free and clear of liens, which was clearly a false statement; (3)
21 Karaeff's relationship with Debra was such that statements by Debra carried significant weight
22 on a personal level, given their friendship, and on a professional level, given Debra's
23 presentation as an individual with knowledge and expertise in real estate development. The

---

26     [8] The Court finds direct, culpable, conduct by Debra and involvement by her in the fraud such that it is her own. On these facts, the Court need not find a "de facto partnership" through which to impute Toby's fraud to Debra under agency and partnership principles discussed *infra* at Section III. The Court, while not foreclosing the possibility that Debra could be found liable on a partnership theory, determines that the nature of Debra's involvement supports finding direct liability under the law of this Circuit.

-24-

1  Court believes that Toby, on his own, could not have obtained this $100,000. Debra's conduct,

2  through these false and misleading statements, was essential to Karaeff's decision to advance

3  funds.

4       Toby then came to Karaeff on the date in question and said that he needed $100,000 to

5  finish the house on Lot A. This statement was false when made. The money that Karaeff loaned

6  was never used to develop Lot A. In his trial testimony, Toby said he could not recall whether

7  any amount of that sum was used in the construction on Lot A. But during his deposition, Toby

8  admitted that none of the proceeds of that loan was used for Shady Glen. Toby intended to

9  deceive Karaeff by inducing her reliance on the false statement. He did so, and Karaeff

10  justifiably relied on Toby's statement. Damages resulted when the money, loaned for the

11  completion of Lot A, was not used in any part for that purpose and was not returned to Karaeff..

12       The Ninth Circuit has ruled, under similar facts, that an individual in Debra's position

13  may be held directly responsible for her role in a fraudulent scheme. *Lansford,* 822 F.2d at 904-

14  905. The Ninth Circuit's reasoning in *Lansford* is particularly apposite to the present facts. In

15  *Lansford*, debtor husband made a false financial statement in connection with a purchase of a

16  restaurant from plaintiff. After debtor husband and debtor wife jointly filed bankruptcy, plaintiff

17  brought an action under 523(a)(2)(B) against both husband and wife. Instead of relying on

18  imputation on a partnership theory through agency principles, the Ninth Circuit cited evidence

19  operating to connect debtor wife to the financial statement and the deception. Evidence

20  establishing the debtor wife's direct role in the fraud included findings that: (1) debtor wife was

21  involved in initiating discussions with La Trattoria, even if through her husband; (2) debtor wife

22  discovered the potential restaurant venture; and, (3) debtor wife signed the purchase documents

23  transferring the restaurant which repeated a misrepresentation contained within the false

24  financial statement. *Id* at 904. The Ninth Circuit found debtor wife "culpably responsible"for

25  the fraud. *Id.* It reversed the ruling of this Circuit's Bankruptcy Appellate Panel ("BAP") that

26  had declined to impose liability on debtor wife due to lack of "knowledge or connivance" on her

27  part. *Id* at 903.

28       Although Debra was not physically present when Karaeff loaned $100,000 at a meeting

-25-

with Toby, this event occurred approximately one month after Debra and Karaeff visited Shady Glen, and approximately two weeks after Debra made other false statements about Shady Glen in connection with the "partnership" for the development of Lot B. In the middle weeks of August, Debra was instrumental in the process by which Karaeff obtained the line of credit through which Karaeff would fund advances to Hart entity projects. The Court finds Debra's role in the fraud to be direct and essential to its success. Her false statements regarding Lot A in July and early August of 2007 are properly carried forward to the August 27, 2007 transaction date. Finding Debra responsible for the $100,000 loaned as a result of her affirmative, culpable, conduct is the proper result.

Based on the foregoing, all elements of 523(a)(2)(A) are established with regard Debra's fraud relating to Karaeff's advancing $100,000 on August 27, 2007. This amount is non-dischargeable in her bankruptcy.

### 2.        The December 10, 2007 $50,000

The analysis of whether Debra participated in the conduct that led to the December 2007 $50,000 is less straightforward. Toby again came to Karaeff saying he needed a loan to finish Lot A. In his testimony, he could not recall whether any amount of that loan went toward the construction on Lot A. Unlike the August $100,000 loan, Toby was not confronted with any prior testimony that the December $50,000 did not go to develop Lot A. There is no record before the Court that the money went elsewhere.

Even so, the Court could determine based on the facts and circumstances that Toby's statement was false and made with a fraudulent intent. *Ettell*, 188 F.3d at 1145. The circumstantial evidence of falsity could be set forth as follows: (1) that the Harts had previously obtained money from Karaeff using false pretenses, i.e. the two August transactions where funds did not flow to projects as represented; and, (2) that the sum of $50,000 did not, in fact, complete the construction of the house on Lot A.

This circumstantial evidence is not especially convincing. It would require a conclusion that money obtained by the Harts never went where the Harts said it was going, without regard to specific testimony or documentary evidence. Also, even though construction of Lot A had not

-26-

gone smoothly, no evidence was presented by Karaeff that a contribution of $50,000 in December 2007 could never have finished the house. Furthermore, it is not clear that Karaeff relied on the aspect of the statement that at least implicitly promised expeditious completion of the project. For these reasons, the Court will not conclude that the statement was false when made.

Additionally, even were the Court to conclude that the loan was obtained through fraud by Toby, the evidence does support a finding that Debra should be responsible for the debt. In contrast to the August 27 transaction, the Court believes that by December, the events of late summer 2007, that led the Court to conclude that Debra's involvement was a material factor in the success of the fraud, had become substantially attenuated from the $50,000 December loan. Karaeff testified that Debra knew about this loan, and the Court is inclined to believe her. Nonetheless, Debra's involvement in the December transaction was extremely limited. The Court does not find evidence of direct involvement by Debra sufficient to find this amount non-dischargeable in her bankruptcy.

### C.    523(a)(2)(A) Regarding the Mendelson $100,000

The Court finds Karaeff's testimony credible on the Mendelson transaction, in contrast to the Harts' testimony which was evasive and relied on facts not proven in this trial. The Court finds that Debra and Toby jointly participated in this fraud, each making statements to solicit the Mendelson $100,000 from Karaeff. Toby made the false statement that he would loan, on Karaeff's behalf, $100,000 to his friend. Debra's statement "it will be okay" appears, at a minimum, to be sufficiently reckless to be a false statement under 523(a)(2)(A). Even without finding that this statement on its own supports a claim for non-dischargeability, Debra's role in inducing Karaeff's reliance on a false statement made by Toby is sufficient direct involvement in the fraud such that fraudulent intent by Debra is found and she, under *Lansford*, is responsible for any non-dischargeable debt.

The $100,000 was deposited into the Two Harts account on May 22, 2008. Toby, when cross-examined, was unable to demonstrate how the funds were disbursed to Mendelson. His best explanation was that a $43,000 withdrawal on May 7, 2008, coupled with a $50,000 draw

-27-

on "another" Two Harts account, amounted to a transfer of the Karaeff funds to Mendelson. But the existence of another Two Harts checking account was not corroborated by any evidence. Lance himself testified that Two Harts only had one checking account. Toby's testimony that he thought Two Harts had another bank account is patently unreliable. Moreover, Mendelson testified that he did not receive $100,000 from Toby at any time in 2008. It follows that Toby made a false statement – that he would lend the money to his friend – as, in fact, the $100,000 never went to Mendelson. Toby knew the statement was false when he made it. He never intended to loan money to Mendelson on Karaeff's behalf. It is far more likely that Toby, still not receiving construction draws at this time, was either seeking additional funds to finish construction on Lot A or seeking funds to pay some other obligation. Karaeff had already committed $350,000 from prior transactions. He induced her reliance, once more, on a statement he knew was false.

The Court will next assess whether Debra's statement, "it will be okay", was so recklessly indifferent to the truth as to be fraudulent. *See In re Rubin*, 875 F.2d 755, 759 (9th Cir. 1989) ("[O]pinions as to future events which the declarant does not, in fact, hold or declarations made with reckless indifference for the truth may be found to be fraudulent") (citing *In re Fordyce*, 56 B.R. 102, 105 (Bankr. M.D.Fla. 1985)). Debra was, at best, recklessly indifferent to the truth of her comforting assertion that Karaeff's money was safe with Mendelson, via Toby. Furthermore, the context of the transaction suggests that Debra knew Toby's motives and that the money was not going to Mendelson.

Debra added her statement to bolster Toby's false statement and to induce Karaeff's reliance. The Court need not find this statement false in itself. It is the most significant evidence of Debra's involvement in the fraud, which was as follows: (1) Karaeff was Debra's friend, who was socializing with Debra and Toby on the night the transaction occurred; their relationship was such that Karaeff would rely on Debra's advice and opinion; (2) Were the money to go to Shady Glen (and it appears that it was never transferred to Mendelson out of the Two Harts account), Debra would directly benefit from the Karaeff loan as it would go toward the construction of her home in an otherwise economically challenged project; (3) Debra,

-28-

1  knowing that the money was not going to Mendelson, offered her assurance through smiling and

2  saying "it will be okay."  This statement was intended to induce Karaeff's reliance on Toby's

3  false statement.  Finding Debra directly involved with the fraud, this Court concludes that this

4  debt may be determined non-dischargeable in Debra's bankruptcy.

5        Karaeff's reliance on these statements was justifiable.  Given the close relationship of the

6  parties, an individual in Karaeff's position would justifiably rely on Toby's statement alone.

7  Debra also had an important role in inducing reliance, through her own statement.  Toby's

8  proposition, together with Debra's assurance, establishes justifiable reliance for an individual in

9  Karaeff's state.  The Court finds that Karaeff was damaged by the fraud as the money that

10  Karaeff loaned never reached its intended destination with Mendelson and was not otherwise

11  returned to her.  All elements of 523(a)(2)(A) established, the Mendelson $100,000 is non-

12  dischargeable in Debra Hart's bankruptcy.

13        **D.      523(a)(4) with Respect to all Transactions**

14        In the First Amended Complaint, filed August 27, 2013, Karaeff pleads all four

15  transactions under 523(a)(4) which excepts from discharge "any debt for fraud or defalcation

16  while acting in a fiduciary capacity..."  Karaeff pleads defalcation by a fiduciary under various

17  theories; she does not plead actual fraud by a fiduciary.  It appears from the dismissals submitted

18  by Plaintiffs' counsel in open court on August 8, 2013 that Karaeff intended to dismiss all causes

19  of action against Debra under 523(a)(4) arising out of the $250,000 in loan transactions; that is,

20  all advances except for the alleged $200,000 partnership interest.  Though the ultimate

21  disposition of these causes of action is the same whether such claims are deemed dismissed or

22  determined herein, for the sake of thoroughness the Court will address all causes of action pled.

23        The Ninth Circuit has set forth three elements necessary to find a defalcation under

24  523(a)(4): (1) that an express trust existed; (2) that the debt was caused by defalcation; and (3)

25  that the debtor acted as a fiduciary to the creditor at the time the debt was created.  *In re Niles*,

26  106 F.3d 1456, 1459 (9th Cir. 1997).  The United States Supreme Court has recently ruled that

27  defalcation requires intentional conduct including "not only conduct that the fiduciary knows is

28  improper but also reckless conduct...if the fiduciary consciously disregards or is willfully blind

-29-

to a substantial and unjustifiable risk." *Bullock v. BankChampaign, N.A.*, 133 S.Ct. 1754, 1759 (2013) (internal citations omitted).

Courts look to state law to determine if an express trust was created. *Ragsdale v. Haller*, 780 F.2d 794, 796-97 (9th Cir. 1986); *In re Baird*, 114 B.R. 198, 202 (B.A.P. 9th Cir. 1990); *In re Utnehmer*, 499 B.R. 705 (B.A.P. 9th Cir. 2013) ("partner has a duty to hold as trustee any property, profit, or benefit derived from partnership business or use of partnership property") (citing Cal.Corp.Code § 16404(b)(1)). The statute (or agreement) creating the trust must "define the trust res, spell out the trustee fiduciary's duties and impose a trust prior to and without reference to the wrong which created the debt." *Id.* And in order for there to be a trust "res" there must be property that is entrusted to the debtor-fiduciary. *Cal-Micro v. Cantrell (In re Cantrell)*, 329 F.2d 1119, 1125 (9th Cir. 2003); *In re Evans*, 161 B.R. 474-78 (B.A.P. 9th Cir. 2001).

All causes of action for defalcation concerning the $250,000 in loans advanced between August 2007 and May 2008 fail for lack of an express trust relationship. Each of these amounts was negotiated by Toby, with varying amounts of involvement from Debra, and each was paid to Two Harts, Inc. The Court cannot conclude that when Karaeff loaned money to Two Harts, via Toby, for the development of Lot A or allegedly to Mendelson, via Toby, for any purpose, Karaeff was committing funds to any partnership that would give rise to an express trust and fiduciary duties between and amongst the parties. Finding no express trust, causes of action for defalcation under 523(a)(4) fail for each of these loans.

Karaeff's only conceivable partnership relationship with a Hart-controlled entity existed in her role as "limited partner" in what the Harts convinced her was a valid partnership, GTP II, with NHII as general partner.

GTP II was purportedly created to develop Lot B. However, unbeknownst to Karaeff, a partnership was never actually formed nor did the Harts intend to form one. Karaeff transferred $200,000 to Two Harts, Inc. which never had a legal relationship with GTP II. As no funds were ever held in trust by GTP II or NHII, its general partner, there is no express trust for lack of an identifiable trust res. *In re Cantrell*, 329 F.2d at 1125. Because there was no trust res held by

-30-

1  Debra or NHII that could either support trust creation or become the subject of defalcation, this

2  claim must fail.

3          Karaeff testified that when she asked why she was not sending funds to NHII, the general

4  partner, both Debra and Toby told her that NHII and Two Harts were the same thing.  The Harts

5  telling Karaeff that the entities were the same thing is certainly misleading, and it might assist in

6  establishing fraud.  But given the lack of an express trust, a strict requirement under Ninth

7  Circuit authority, there can be no defalcation.

8          **E.      Embezzlement with Respect to all Transactions**

9          As her final claim, Karaeff seeks to have any of her money or any of GTP II's assets that

10  were lawfully possessed by Debra or NHII and thereafter misappropriated excepted from

11  discharge for embezzlement under 523(a)(4).  No fiduciary relationship is required for a finding

12  of embezzlement.  The three elements of embezzlement are: (1) property rightfully in the

13  possession of a non-owner; (2) non-owner's appropriation of the property to a use other than

14  which it was entrusted; and (3) circumstances indicating fraud.  *In re Littleton*, 942 F.2d 551,

15  555 (9th Cir. 1991).

16          As pled, embezzlement is vaguely set forth without respect to any specific transaction.[9]

17  For the August 2007 $200,000, the argument could be made that the investment was rightfully in

18  the possession of a non-owner, Two Harts Inc., and was appropriated to a use other than for

19  which it was entrusted, i.e. to go into the partnership, which never happened.  The circumstances

20  indicating fraud would be statements from the Harts that Two Harts and NHII were the same

21  thing, which is misleading at best.  Still, Debra never held the $200,000 herself.  Therefore,

22  embezzlement cannot be established as to her personally without first disregarding Two Harts,

23  Inc. on an alter ego theory.  There is no record before the Court on which to disregard Two Harts

24  and hold Debra responsible for any embezzlement by an entity, Two Harts, in which she had no

25  ownership or management role.

26

27  ───────────────

28          [9] As a preliminary matter, the Court notes that the money advanced by Karaeff was committed on pretenses that it would be spent – it was not "entrusted" in any manner that appears to give rise to a claim for embezzlement.

-31-

1    The "middle" $150,000, consisting of the August $100,000 and December $50,000, was

2    loaned to Toby, and deposited into the Two Harts account, on pretenses that it would be used to

3    finish Lot A.  At least as to the $100,000, Toby admitted in his deposition that the money did not

4    go to Lot A.  The record on the disposition of the $50,000 is not clear.  In any event, there was

5    no showing that Debra, acting on behalf of Two Harts, misappropriated the funds under

6    circumstances indicating fraud.  In similar fashion, the elements of embezzlement were not

7    proven as to Debra with regard to the Mendelson $100,000.

8        Based on the foregoing, all embezzlement claims fail to establish alleged debts as non-

9    dischargeable in Debra's bankruptcy.

10                    **III. KARAEFF'S CAUSES OF ACTION AGAINST LANCE**

11       Karaeff does not assert that Lance Hart expressly made any false statements to her in

12   connection with the transactions described above.  She nonetheless argues that he is liable to her

13   for the entire $450,000 that she advanced to Debra and Toby, and that such debt is non-

14   dischargeable under Section 523(a)(2)(A), based upon theories of imputed liability.

15       Karaeff asserts that this Court may impute Debra and Toby's fraud in this matter against

16   Lance based on theories emanating from partnership or corporate law.  The Court rejects both

17   theories.

18   **A.      No 523(a)(2)(A) Liability for Lance as a "de facto partner" of Toby and**

19   **         Debra.**

20       Karaeff urges this Court to find that Debra, Toby and Lance were members of a "de facto

21   partnership", based upon their long association in various real estate ventures.  Should the Court

22   make such a finding, Karaeff asserts that Lance would be liable for the actions of his partners

23   Toby and Debra, including their fraudulent statements to Karaeff, and may have his debt to

24   Karaeff determined to be non-dischargeable, based upon the holding in *Strang v. Bradner*, 114

25   US 555 (1885).  In *Strang* the United States Supreme Court held, in relatively conclusory

26   fashion, that the fraud of a non-debtor partner may be imputed to the debtor, and the debt

27   declared non-dischargeable, without regard to the debtor's participation in or knowledge of the

28   wrongdoing.  *Strang*, 114 U.S. at 561.

-32-

1    More recently, numerous cases in this circuit have addressed the question under what

2    circumstances a court may impute the fraud or other wrongful conduct of a non-debtor party

3    against the debtor for purposes of determining dischargeability of debt.  In *In re Cecchini*, 780

4    F.2d 1440 (9th Cir. 1986), the Ninth Circuit, citing basic partnership law, held that a business

5    partner's debt was non-dischargeable because he had participated in the benefits of his partner's

6    misconduct, which had been undertaken on behalf of the partnership, and in the ordinary course

7    of business.  *Cecchini*, 780 F.2d at 1444.  Shortly thereafter, the Ninth Circuit in *Lansford*,

8    discussed earlier, held that there was sufficient circumstantial evidence of a wife's participation

9    in a fraudulent scheme that had been engineered principally by her husband to have her debt also

10   declared non-dischargeable, her failure to have made affirmative fraudulent statements

11   notwithstanding.  The court also noted however, that under the rule set forth in *Cecchin*i, that

12   non-dischargeability may be determined on the basis of "strict agency or partnership principles",

13   the court could find a debt non-dischargeable, regardless of  the debtor's knowledge or

14   culpability.  *Lansford,* 822 F.2d at 904.  In light of the Bankruptcy Code's purpose of providing

15   a fresh start, and the decisions of other circuits refusing to apply agency principles absent some

16   culpability on the part of the party to be charged, the court indicated (admittedly in *dicta*) that

17   "the breadth of the proposition stated in *Cecchini* deserves more thorough consideration."  *Id*. at

18   905.

19       In 2002 the BAP, citing *Strang* and the failure of Congress to overrule the holding of that

20   case in enacting Section 523(a)(2) of the Code, held in *Tsurukawa v. Nikon Precision, Inc. (In re*

21   *Tsurukawa)*, 287 B.R. 515 (B.A.P. 9th Cir. 2002) that it was appropriate to impute the fraud of a

22   husband against debtor wife for purposes of determining the dischargeability of a debt against

23   wife, where the husband and wife had formed a business partnership with respect to the entity

24   which husband used to defraud a third party.  The court focused on the existence of a business

25   partnership, as demonstrated via numerous actions by the wife in furtherance of the business

26   purpose, each of which was, admittedly, not per se nefarious  (e.g., her formation of and

27   ownership of "High Innovation", the entity via which husband bilked his victim, her knowledge

28   that the business of High Innovation was comprised solely of revenues from the plaintiff, her

-33-

opening of bank accounts for High Innovation, and writing checks on the accounts, including

significant checks in payment of family expenses, her leasing business space for the company,

etc.), and the resulting agency relationship between husband and wife in determining that it was

appropriate to impute husband's fraud, and in particular his intent to defraud, to his wife.

*Tsurukawa*, 287 B.R. at 522-25.

In light of the wife debtor's numerous activities undertaken in connection with the

business partnership, *Tsurukawa* could stand for the proposition that a debtor who so participates

in and enables the fraud of another may be liable for non-dischargeability purposes even where

debtor had neither made an affirmatively fraudulent statement or even understood the full scope

of the fraudulent scheme. Such a ruling would both be consistent with the facts of *Tsurukawa*, as

well as sensitive to the Ninth Circuit's apparent concerns in *Lansford* concerning the problems

with an imputation rule based on strict agency principles.

In *Sachan v. Huh (In re Huh)*, __ B.R.__ (B.A.P. 9th Cir. March 11, 2014) the BAP,

sitting *en banc*, recently held in a manner consistent with this analysis. The analysis in *Huh*

comports with the result and the rationale adopted by the Supreme Court in *Bullock*, which,

although it concerned liability under Section 523(a)(4), at least suggested that the Supreme Court

was uncomfortable with strict liability determinations in the non-dischargeability realm. *Huh*

instructs that if fraud is to be imputed between partners, a court the must not merely identify the

wrongful actions of the debtor's agent/partner, but must focus on knowledge of or conduct by the

debtor that indicates culpability of the debtor.[10] In support of this proposition, the BAP wrote,

"[w]hile the principal/debtor need not have participated actively in the fraud for the creditor to

obtain an exception to discharge, the creditor must show that the debtor knew, or should have

known, of the agent's fraud." The BAP's holding in *Huh*, though it does not bind this Court, is

entirely consistent with the analysis herein.

---

[10] To the extent that the BAP ruled in an unpublished decision, *Haig v. Shart (In re Shart)*, 2013 Bankr. LEXIS 5513 (B.A.P. 9th Cir. April 2, 2013), that no knowledge of fraud, or participation in fraudulent acts, was necessary to impute non-debtor's fraud to partner/debtor, it appears to this Court that *Huh* supercedes *Shart,* if it does not expressly overrule it, with respect to that proposition.

-34-

The initial question that the Court must address is whether there existed a business partnership between and among Toby, Debra and Lance, with respect to the wrongful conduct of Debra and Toby. Absent evidence of such a business partnership, there is no basis to impute liability from Toby and Debra to Lance. *Hawkins v. Franchise Tax Bd. et al. (In re Hawkins)*, 430 B.R. 225, 239 (n. 25) (Bankr. N.D. Cal. 2010).

A "partnership is an association of two or more persons to carry on as co-owners a business for a profit". Cal. Corp. Code § 16101(7). Moreover, an association to carry on as co-owners a business for a profit forms a partnership under California law, "whether or not the persons intended to form a partnership." Cal. Corp. Code § 16202(a); *see also*, *Kahn Creative Partners, Inc. v. Nth Degree, Inc.*, 2011 WL 1195680 at *6 (CD Cal. 2011 March 20, 2011)

Under California law, the determination whether individuals have entered into a partnership, rather than some other form of business relationship, is a question of fact to be determined by the trier of fact from the evidence and inferences to be drawn therefrom, and depends on whether they intended to share in the profits, losses and the management and control of the enterprise. *Haig v.Shart (In re Shart)*, 2013 Bankr. LEXIS 5513 at *23 (B.A.P. 9th Cir. April 2, 2013) (citing *Bank of Cal. v. Connolly*, 36 Cal. App. 3d 350, 364, 111 Cal. Rptr. 468 (Cal. Ct. App. 1973)). Property co-ownership of any sort, as well as profit-sharing, are factors which tend to establish partnership. *Shart* at 23.

The Court is disinclined to find that Toby, Debra and Lance formed a "de facto partnership" through which Lance may become liable for the fraud of his de facto partners Toby and Debra, for several reasons.

As an initial matter, the Court notes that not only did Toby, Debra and Lance not *form* a partnership between and among themselves to carry on a business enterprise, they affirmatively took steps to avoid any implication that they were acting as partners, by forming, and doing business through, a series of corporations, including, most pertinent to this discussion, NHII. The Harts' choice of the corporate form is strong evidence that they chose to do business via a corporation, and not a partnership. While the Court recognizes that it may be appropriate in some circumstances to deem a business relationship a "partnership", including in "default"

-35-

situations where the parties have neglected to avoid that implication by choosing a different business form, the Court believes that it would be anomalous, at best, to superimpose a "de facto partnership" on parties who not only did not choose that form, but in fact affirmatively chose another form of business entity. See, e.g., *Bank of Cal. v. Connolly*, 36 Cal. App. 3d at 364.[11]

Moreover, Karaeff does not define the business purpose or scope of the entity-to-be-implied, leaving the Court uncertain how it should define the contours of the de facto partnership that Karaeff urges be imposed. Karaeff's generic statement that Toby, Debra and Lance have long operated a de facto partnership by virtue of their more than twenty year association to remodel and develop real property, and should therefore be deemed to be partners in some manner that would impute liability against Lance for Toby and Debra's fraud, is simply too imprecise to be of assistance here. Moreover, this sweeping assertion ignores the undisputed testimonial evidence about the evolving nature of the Harts' business operations over the years. While Toby and Lance did work together on home repair and remodeling projects for many years, they did so solely via several corporations, and Debra played no role in those repair projects. It was much later that the Harts began to use NHII as a vehicle for more complex remodeling and property development projects, including Shady Glen. The nature of this "business" therefore changed significantly over the years, and the Court is unwilling to imply a "partnership" from these disparate and evolving activities.

The Court notes that in most cases in which a court has imputed fraud based on a business partnership, defining the contours of that partnership has posed no challenge whatsoever. For example, in *Strang* the Supreme Court dealt with a law partnership, not exactly a controversial example of a business partnership. In *Tsurukawa*, the BAP dealt with the efforts of a husband and a wife in connection with a company the sole purpose of which was to defraud

---

[11] California law recognizes a limited exception for the situation where individuals form a partnership pre-incorporation of the corporate entity that will, in effect, carry out the purposes of the partnership. Where the corporation is formed "as a mere agency for more conveniently carrying out the agreements between" partners, the California Supreme Court on one occasion instructed that partnership duties, and causes of action related thereto, survive even in light of some operation by the parties through a corporation. *Shorb v. Beadry*, 56 Cal. 446, 449 (Cal. 1880). *Shorb*, though dated, is still authority in California. *See, e.g.,Persson v. Smart Inventions, Inc.*, 125 Cal.App. 4th 1141, 1157 (Cal. Ct. of App. 2005).

-36-

1  the plaintiff.  This Court submits that it would be a perilous and unreliable exercise for courts to

2  impose a partnership where it is not clearly evident on the facts what the scope and purpose of

3  the purported business partnership was, particularly where that relationship is a necessary first

4  predicate for imputed fraud liability.  *Hawkins*, 430 B.R. at 239 (n. 25).

5         Even were one to indulge a more immediate "deemed partnership" based on the events of

6  August 2007 onward, it is difficult to conclude that Lance would have been a partner in any such

7  entity.  For example, though not specifically pled or argued by Karaeff, it could be alleged that

8  Toby, Debra, and Lance formed a partnership around July or August 2007 with the business

9  purpose of completing Lot A of Shady Glen and that this endeavor led them, as a partnership,

10 fraudulently to obtain funds from Karaeff.  The argument would be that Debra, the owner of Lot

11 A, stood to benefit directly from the completion of the house on Lot A and that Toby, though he

12 had no direct legal interest in the property, would indirectly benefit from residing at what was to

13 be the couple's home.  As for joint management and control of the partnership, it could be

14 contended that Toby and Debra went about conducting "partnership" business by obtaining

15 monies from Karaeff.  There were no corporate or other entities established for the purposes of

16 this potential deemed partnership – GTP II was a sham and the money, though it flowed into

17 Two Harts Inc., was effectively controlled by individuals who could be deemed partners.

18        The Court has concluded that Toby and Debra committed fraud against Karaeff with

19 respect to three transactions.  Even assuming a partnership in fact for the development of Lot A,

20 the Court does not find any meaningful connection between the wrongful conduct of Toby and

21 Debra and any business partnership between and among Toby, Debra and Lance, let alone any

22 knowledge by Lance of alleged wrongdoing or wrongful conduct by Lance, as required by *Huh*.

23 Lance did not figure to benefit economically from the completion of the house on Lot A.  At

24 best, he merely provided services to any "partnership" for the completion of that property.

25 Lance was not involved in the management and control of any partnership efforts to obtain

26 funding for the completion of Lot A.  Moreover, Lance built homes through Two Harts Inc.

27 which was his chosen corporate form – he was not directly, nor through Two Harts, doing

28 business within any partnership.  And finally, it is not clear that Karaeff's investment or loan

-37-

monies ever went to Lot A.  The partnership in fact, if any, appears to exist solely in Toby and Debra's designs to bilk Karaeff.  Their liability, established above and recounted below, is direct and there is no reason to impute it to Lance.

Examining the details of the fraudulent transaction yields the same result.

Toby and Debra defrauded Karaeff when they induced her to invest $200,000 into a partnership, GTP II, that was to obtain and build a house on Lot B of Shady Glen.  This transaction occurred on August 17, 2007.  At this point in time, NHII no longer owned Shady Glen; rather that property was the sole and separate property of Debra.  And GTP II was never actually formed, it was simply a ruse to dupe Karaeff.  There was no evidence that Lance pursued with his parents a shared business purpose related to GTP II, or that he co-owned any property associated therewith, or derived any "profit" from GTP II, or Shady Glen, or took any action from which a shared business enterprise could be found.  To the extent that the fraud involved a potential development of Lot B, Debra alone owned that property, and Lance had neither any direct nor any indirect interest therein.

Toby and Debra next defrauded Karaeff when they induced her to loan $100,000 to Toby on August 27, 2007 for the stated purpose of completing construction on Lot A.  Again, there is no evidence that Lance played any part in this loan, or that the loan was used to further a business purpose that Lance shared with Toby, or that it was used in connection with property that they co-owned or managed, or that Lance received any benefit from the profits of this shared activity.[12]

Lastly, Toby and Debra defrauded Karaeff when they induced her to loan $100,000, ostensibly to Mendelson in May 2008.  During his testimony at trial Toby was unable to establish that these funds actually went to Mendelson, and it appeared much more likely that they were used to repay some other obligation of Toby's.  Again, there is no evidence that these

_____

[12] To the extent that moneys from Karaeff were paid to Two Harts, Inc., that company was owned by Lance, and not by Toby or Debra, and was performing the construction work on Lot A (and other projects).  There is no suggestion that Lance or Two Harts received any funds from Karaeff, or Toby, as profits from co-ownership or co-management of a business.  To the contrary, moneys were paid to Two Harts as compensation for its work on Lot A, in which Lance had no interest, other than to be paid for materials supplied and work performed.

-38-

1  funds were used in connection with a business partnership that Toby shared with Lance, or that

2  Lance played any role in the disposition of these funds.

3  Accordingly, the Court is unwilling to find Lance liable to Karaeff under any imputed

4  fraud theory based on the existence of a de facto partnership.

5  **B.      No 523(a)(2)(A) Liability for Lance as Alter Ego of Two Harts or NHII**

6  Karaeff argued that Lance could be liable for fraud under corporate theories in his

7  respective roles for corporations NHII and Two Harts. To state the obvious, finding fraud by a

8  corporate entity is the predicate to finding an individual "alter ego" responsible for that fraud.

9  The Court finds no fraud by either NHII or Two Harts, and thus it can find no fraud by Lance.

10  NHII did not participate in the fraud or the business activities associated with that fraud.

11  To the extent that NHII was purported to be the general partner in GTP II, that partnership was

12  never formed, i.e. there was never any partnership property as Karaeff's subscription went

13  directly to Two Harts, Inc. While finding Karaeff's testimony credible that Debra and Toby

14  gave her, and she signed, partnership documents and committed funds based on false pretenses

15  and affirmative misrepresentations by both Toby and Debra both oral and within the LPA and

16  SA, GTP II was never established. Instead, it was a ruse created by Debra and Toby to solicit

17  funds from Karaeff. No fraud found by NHII, Lance as officer or shareholder cannot be found

18  responsible on a corporate theory.

19  If Two Harts committed fraud, it is at least possible that Lance could be held responsible

20  for that fraud on an alter ego theory. Lance was the owner and manager of Two Harts, and all of

21  the funds advanced by Karaeff flowed to that corporation. Karaeff, however, made no showing

22  that Two Harts committed fraud. Although Two Harts received the money, it was not itself

23  involved in any fraud that gave rise to those advancements. The fact that Two Harts spent the

24  money obtained by fraud is not, per se, evidence of Two Harts' participation in that fraud.

25  Finding no fraud by Two Harts, it follows that Lance cannot be responsible for any fraud on a

26  corporate theory of alter ego, with respect to that corporation.

27

28

-39-

**C.      No 523(a)(4) Liability for Lance for Defalcation or Embezzlement**
**Concerning Any Transaction**

Karaeff also asserts that alleged debts owed by Lance should be determined non-dischargeable under 523(a)(4), pleading both defalcation and embezzlement as to all four transactions.[13]

For the reasons stated in Section III.D., the Court finds that none of the transactions created an express trust with a res that could thereafter be the subject of defalcation.  It follows that these debts could not be determined non-dischargeable as to Lance, even were the corporate forms of NHII or Two Harts disregarded.

And for the same reasons set forth with respect to any embezzlement claim against Debra, no vaguely pled embezzlement cause of action can give rise to non-dischargeability in Lance's bankruptcy.  Lance is not determined to be the alter ego of Two Harts, the non-owner in possession of the funds pled under that theory.

## IV. AFFIRMATIVE DEFENSES

**A.      Novation, Accord and Satisfaction**

Defendants assert as an affirmative defense that Toby and Karaeff's oral agreement in the fall of 2008 – that Toby would pay Karaeff $500,000 at fifteen percent (15%) interest, thereafter modified to twelve percent (12%) interest – constituted either a novation of prior obligations or an accord and satisfaction thereof.  Therefore, based on these theories, Defendants argue that any allegation of fraud will not survive a subsequent novation, accord, or satisfaction.

Novation is the substitution of a new obligation for an existing one.  Cal. Civil.Code § 1530.  Under California law, in order to find a novation, "the intention of the parties to extinguish the prior obligation and to substitute a new agreement in its place must clearly appear."  *Hunt v. Smyth*, 25 Cal.App.3d 807, 818 (Cal. Ct. App. 1972) (quoting *Goodman v. Citizens Life & Cas. Ins. Co.*, 253 Cal.App.2d 807, 816 (Cal. Ct. App. 1967)).  Where a new oral

---

[13] While the Court believes, as noted in n.3, *supra*, that on August 8, 2013 Plaintiff may have intended to dismiss causes of action against Lance under any defalcation theory, the Court will adjudicate the FAC as filed thereafter on August 27, 2013.

-40-

agreement replaces a prior written agreement, the existence of the oral agreement must be shown with clear and convincing evidence. *Columbia Cas. Co. v. Lewis*, 14 Cal.App.2d 64, 72 (Cal. Ct. App.1936).

Karaeff acknowledged that the oral agreement with Toby concerning the consolidated $500,000 was a new agreement under which the parties operated – the Court surmises from the context that the agreement was entered into at some point in the late summer or fall of 2008, before interest payments to Karaeff began in December 2008. Though the elements of novation were not argued with any precision by either side during the trial, the Court will assume a novation in fact occurred for the sake of the following analysis.

Even if a novation occurred, such novation cannot vitiate fraud in the prior agreements. The BAP has concluded, "[n]ovation or not, fraud in the initial application cannot be excused when a loan is renewed, particularly where the creditor is unaware of the initial fraud." *In re Gertsch*, 237 B.R 160 (B.A.P. 9th Cir. 1999). *Gertsch* concerned a false financial statement in writing used to obtain a loan that was thereafter renegotiated, thus raising the potential defense of novation. Though it was decided under 523(a)(2)(B), the holding in *Gertsch* properly applies to Karaeff's claims under 523(a)(2)(A).

Any novation in 2008 was an agreement to restructure the prior obligations – the $200,000 partnership investment, the "middle" $150,000 in loans, the Mendelson $100,000 loan, and the missed interest payments – into one obligation of $500,000. Karaeff was not aware of any fraud in connection with the prior advances of money at the time she entered into the new agreement. The Court concludes that Debra's fraud, as found above, will not be vitiated by any novation.

An accord is an agreement to accept, in extinction of an obligation, something different from or less than that to which the person agreeing to accept is entitled. Cal. Civil.Code § 1521. The above analysis concerning novation applies equally to the concept of accord. As an affirmative defense, accord and satisfaction cannot operate to vitiate fraud in the former agreement when the plaintiff so agreeing is not aware of the fraud at the time of the accord.

-41-

### B. Statute of Limitations

Finding no defalcation, above, the Court need only assess the statute of limitations defense against fraud under the California Code of Civil Procedure ("Cal. CCP") – three years from discovery by the aggrieved party of the facts constituting the fraud. Cal.Civ.Proc.Code § 338(d) (2014). And finding no liability for Lance, the statute of limitations need only be assessed in Debra's case. During the trial proceedings, Defendants also raised a defense under Cal. CCP § 339 – two years for an oral contract. Cal.Civ.Proc.Code § 339 (2014).

Debra's bankruptcy was filed on March 4, 2011, and Karaeff's adversary proceeding was timely filed thereafter. In order for any cause of action for fraud under 523(a)(2)(A) to be barred, such cause of action must have accrued with discovery by Karaeff before March 5, 2008. As a general rule, the defendant who raises the defense of the statute of limitations has the burden of establishing when the cause of action accrued and the limitations period ran. When the discovery rule of Cal. CCP § 338(d) is invoked by the plaintiff, the plaintiff has at least a concurrent burden to demonstrate that the fraud was not discovered within the three year limitations period after accrual. *Samuels v. Mix*, 22 Cal. 4th 1 (Cal. 1999).

The three year statute of limitations defense was not argued with any precision by the Defendants, and is of no aid to them for several reasons.

First, the Mendelson $100,000 of May 20, 2008 would not be barred by Cal. CCP § 338(d) even had it been discovered immediately. As to the remaining three transactions, Karaeff did not discover facts sufficient to put her on inquiry notice of a cause of action for fraud until undertaking a search of the public records in July or August 2009. None of her claims against Debra under 523(a)(2)(A) are barred by the three year statute.

Defendants argued in a Rule 52 Motion for Judgment on Partial Findings, and repeated in their closing brief, that the two year statute of limitations applies, and bars any claim, as an oral agreement was made between Toby and Karaeff (as noted by the Court, sometime after August 27, 2008 and before interest payments began in December 2008) for the consolidated $500,000 loan. Plaintiff argued that the fraud statute of Cal. CCP § 338(d) applies nonetheless, where there was no notice of the fraud at the time that the parties entered into the oral agreement.

-42-

1    Defendants' assertion of this defense certainly approaches, if it does not reach, a level of

2    reckless advocacy by counsel for Defendants. Had counsel conducted any research concerning

3    the defense raised, or applied basic common sense to the question, he would have understood that

4    a cause of action for breach of an oral contract accrues at the time of the breach, and not before.

5    *Admadzai v. Metully*, 2005 WL 2219215 at *2 (E.D. Cal. Sept. 12, 2005) (citing *Cochran v.*

6    *Cochran*, 56 Cal.App.4th 1115, 1124 (1997)). The Court noted this law during the Rule 52

7    Motion, when the defense was first raised, and Defendants' counsel proceeded to include the

8    defense in post-trial briefing without any further showing regarding dates. As payments under the

9    oral contract were made through February 2009, the earliest the contract could have been

10   repudiated would have been when a payment was not received in March. Defendants did not put

11   forth into evidence, as is their burden, the date in March of 2009 on which payment was due and

12   not paid. With no evidence before it that any oral contract was breached before March 5, 2009,

13   barring a claim under Cal. CCP § 339, the Court rejects the Defendants' assertion of an

14   affirmative defense based upon breach of oral contract.

15                                   **V. CONCLUSION**

16          Based on the foregoing, as related to the bankruptcy of Debra Hart, this Court finds debts

17   of $200,000 (August 15, 2007), $100,000 (August 27, 2007) and $100,000 (May 20, 2008) non-

18   dischargeable under 523(a)(2)(A). The facts concerning the $50,000 (December 10, 2007) do not

19   support a determination of non-dischargeability under 523(a)(3)(A). Finally, this Court does not

20   find any amount non-dischargeable under 523(a)(4), defalcation by a fiduciary or embezzlement.

21          For the reasons stated above, the Court will not impute fraud to Lance Hart on a

22   partnership theory or find him individually liable on a corporate alter ego theory. On this basis,

23   all causes of action brought against Lance Hart under 523(a)(2)(A) and 523(a)(4) fail to establish

24   the alleged debts as non-dischargeable.

25          In determining the amount of the non-dischargeable judgment in Karaeff's action against

26   Debra, the Court holds as follows. The $50,000 deemed dischargeable will be deducted from the

27   $500,000 agreement, leaving $450,000 non-dischargeable (including interest, through the time of

28   the $500,000 agreement). Interest payments were received on the $500,000 obligation through

-43-

February 2009.  As the Court has not been provided with the date in March 2009 on which payment was due, the Court holds that interest on the non-dischargeable debt begins to accrue as of April 1, 2009.  The Court determines that pre-judgment interest on the $450,000 is also non-dischargeable, at the California legal rate, from April 1, 2009 through the date of the judgment.

Upon the entry of this Memorandum, the Court will enter the appropriate judgments.

**\*\*END OF MEMORANDUM DECISION\*\***

-44-

COURT SERVICE LIST

Steven J. Hassing
Law Offices of Steven J. Hassing
425 Calabria Court
Roseville, CA 95747

Baron J. Drexel
Law Offices of Baron J. Drexel
212 9th St. #401 Penthouse
Oakland, CA 94607

Beverly Karaeff
P.O. Box 781
Diablo, CA 94528

Debra A. Hart
125 Canada Via
Diablo, CA 94528

Lance E. Hart
218 Amesbury Court
Discovery Bay, CA 94505

-45-